**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHRIS GARDELLA and AARAN RENWICK, individually and on behalf of all others similarly situated,<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT AND BMW OF NORTH AMERICA, LLC,<br><br>　　　Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND** |

Chris Gardella ("Gardella") and Aaran Renwick ("Renwick") (also referred to as "proposed class representatives" or "Plaintiffs") through their counsel, on behalf of themselves and all other individuals and entities similarly situated as more fully described *infra*, initiate this proposed class action against Bayerische Motoren Werke Aktiengesellschaft (hereinafter "BMW AG") and BMW of North America, LLC (hereinafter "BMW NA") (hereinafter collectively referred to as "Defendants") and allege as follows:

1.　　Defendants in this action designed, manufactured and/or sold certain 2019 through and including 2021 model year BMW passenger motor vehicles including 2 Series, 3 Series, 4 Series, 5 Series, 7 Series, X3, X4, X5, X6, and X7 vehicles (collectively "class vehicles" or "class vehicle") equipped with the B58 Gen 2 (TU1) engine (collectively "class engine" or "class engines").[1] Proposed class representatives and members of the proposed classes request injunctive relief, monetary damages, including multiple damages where applicable, court costs and attorney fees against each of the respective BMW entities based upon their breach of express warranty, breach of implied warranty, and violation of

---

[1] Plaintiffs reserve any and all rights to modify the proposed classes, class vehicle and class engine definitions until after the completion of discovery.

consumer protection laws of New Jersey and Florida (jointly referred to as "state consumer protection laws").

2.    The class engine oil pump is reasonably expected by Defendants, proposed class representatives and proposed class members to last the serviceable life of the vehicle that is in excess of 150,000 miles.[2]  The class engine oil pump often fails at less than 50% of their reasonably expected useful life.  Proposed class representatives' class vehicles experienced premature engine oil pump failure or received notice of impending pump failure.

3.    Replacement of a class engine oil pump costs vehicle owners upwards of $3,000.00 to and including over $7,000.00 depending on the class vehicle.  Low or no oil pressure caused by a failing or failed oil pump results in catastrophic engine failure.  Class vehicle engine replacement costs upwards of $20,000.00.  Individuals who own or have owned class vehicles also sustained diminution of the resale value of their class vehicles since knowledge of problems with class engines became public information.

**JURISDICTIONAL AND VENUE STATEMENT**

4.    Federal jurisdiction exists by virtue of the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d), 1453 and 1711–1715 since there are in excess of 50,000 class members and the named proposed class representatives and proposed class members' aggregate damages exceed $5,000,000.00, exclusive of interest and costs.  Minimal diversity exists between the parties with residency in different states.

---

[2] Service and Warranty Information materials for class vehicles have maintenance schedules that extend to 150,000 miles.  There is no scheduled maintenance or replacement recommended for engine oil pump during the entirety of this mileage or time period.  Service and Warranty Information materials for class vehicles recite the following with respect to vehicle maintenance:

> The BMW Maintenance Program is a benefit designed to help reduce the cost of ownership. This program has been devised with the following objectives: to maximize vehicle safety, reliability, and resale value by minimizing breakdowns resulting from wear, and minimizing cost and inconvenience by computing maintenance intervals based upon the specific manner in which each individual vehicle is driven.

5. BMW AG is a person within the context of this jurisdiction's long-arm statute. In the United States, BMW NA acts as the alter ego and/or agent of BMW AG as well as the warrantor with respect to the class vehicles. *In personam* jurisdiction exists over Defendants under this jurisdiction's so-called "long-arm statute." BMW NA maintains its corporate headquarters in New Jersey and Defendants directly and through their agents (including but not limited to authorized BMW dealers) regularly transact business and otherwise derive substantial revenue in this jurisdiction and throughout the entire United States. Defendants also conduct continuous, purposeful and pervasive economic activities in this jurisdiction and throughout the United States. Defendants intentionally and purposefully placed their vehicles and/or components in the stream of commerce in this jurisdiction and throughout the United States. Subjecting Defendants to *in personam* jurisdiction in New Jersey does not violate Defendants' due process rights and comports with requirements of fair play and substantial justice.

6. Venue is conferred by 28 U.S.C. § 1391 as Defendants regularly and purposefully conducted business in this judicial district and a substantial part of the events giving rise to the claim occurred in this judicial district.

**THE PARTIES**

**Plaintiffs**

7. Gardella is an adult individual who resides in Edison, New Jersey. In November 2020, Gardella purchased a new 2021 BMW X5 from Princeton BMW of Hamilton, New Jersey, an authorized BMW dealer. In January of 2026, at approximately 37,865 miles, the engine oil pump in his vehicle failed. Gardella incurred in excess of $9,200.00 to replace the oil pump. Gardella spoke with sales representatives at the authorized BMW dealership and should have been informed of the defective oil pump during the communications at the time of vehicle purchase but was not. Representatives of BMW NA intended to deceive and actually deceived Gardella with respect to the durability of the engine oil pump.

8.    Renwick is an adult individual who resides in Chicago, Illinois.  In February 2023, Renwick purchased a used 2019 X5 equipped with a class engine.  Renwick replaced the engine oil pump in his class vehicle in July 2025.  At the time of the replacement, his class vehicle had approximately 82,594 miles.  Renwick incurred approximately $3,000 in expenses for replacement of the engine oil pump in his vehicle.  BMW NA could have communicated the oil pump defect with Renwick prior to purchase by a number of different methods but failed to do so.

9.    Representatives of BMW NA intended to deceive and actually deceived Renwick with respect to the durability of the class engine oil pump.

**Defendants**

10.    Defendant BMW AG is a duly organized German corporation with a principal place of business in the city of Munich in the province of Bavaria, Germany.  BMW AG designed, manufactured and tested class engines, including but not limited to the oil pump incorporated in class engines.  BMW AG drafted and published the owner's manual and Service and Warranty Information pamphlet and other materials that accompanied class vehicles and/or were published on the Internet in collaboration with BMW NA.  BMW AG is the parent company of BMW NA.

11.    Defendant BMW NA is a duly organized Delaware corporation with a principal place of business located at 300 Chestnut Ridge Road in Woodcliff Lake, New Jersey.  BMW NA manufactures, imports, distributes and/or sells BMW motor vehicles including all class vehicles and also acts as the authorized representative of BMW AG in the United States.  BMW NA operates its national marketing, warranty, consumer relations and engineering offices from its New Jersey facility.  BMW NA also controls all other aspects of its United States activities from New Jersey including class vehicle importation.

12.    BMW NA sells and distributes vehicles manufactured by both BMW AG and BMW NA throughout the United States via a network of over three hundred independent authorized dealerships.

BMW NA drafted and published the owner's manual and Service and Warranty Information pamphlet and other materials that accompanied class vehicles and/or were published on the Internet in collaboration with BMW AG. BMW NA acted, and continues to act, as the warrantor of vehicles constructed by both Defendants sold in the United States.

13.     At all relevant times, BMW NA acted as an authorized agent, representative, servant, employee and/or alter ego of BMW AG performing activities concerning but not limited to advertising, marketing, warranties, warranty repairs, dissemination of technical information and monitoring the performance of BMW vehicles in the United States, including substantial activities that occurred within this jurisdiction. There is sufficient overlapping and intertwining of the activities of BMW AG and BMW NA in the United States that the principles of corporate separateness should not be applied.

14.     New Jersey has the most significant relationship to the conduct that gave rise to this litigation since BMW NA's wrongful activities were orchestrated at its New Jersey headquarters. New Jersey law should govern all substantive aspects of this litigation. That conduct includes concealing defects described in this complaint and other activities to deny warranty coverage to defective engine components that should have been replaced under the new vehicle warranty without cost to the class vehicle owner as described in this complaint.

**CLASS ACTION ALLEGATIONS**

15.     The proposed class representatives bring this proposed action pursuant to Fed. R. Civ. P. 23(b)(1), 23(b)(2) and 23(b)(3) on behalf of themselves and all members of the proposed classes (or any other class authorized by the Court) defined as follows:

**New Jersey Class:** All owners and former owners, lessees and former lessees of class vehicles who purchased or leased their class vehicles in New Jersey, (hereinafter "proposed New Jersey class members" or "the New Jersey class"). Excluded from the proposed class are Defendants together with their officers, directors, employees, assigns, and successors, the Court, Court staff, Defendants' counsel and all respective immediate family members of the excluded entities described above. Also excluded from the proposed class are any and all claims involving personal injury.

**Florida:** All owners and former owners, lessees and former lessees of class vehicles who purchased or leased their class vehicles in Florida, (hereinafter "proposed Florida class members" or "the Florida class").  Excluded from the proposed class are Defendants together with their officers, directors, employees, assigns, and successors, the Court, Court staff, Defendants' counsel and all respective immediate family members of the excluded entities described above. Also excluded from the proposed class are any and all claims involving personal injury.

**Numerosity of the Proposed Class: Fed. R. Civ. P. 23(a)(1)**

16.     The proposed class is so numerous that individual joinder of all potential members is impracticable under Fed. R. Civ. P. 19 or 20.  It is estimated there are in excess of approximately 200,000 class vehicles imported into or constructed in the United States.  Although the number, location and identity of all proposed class members cannot be presently ascertained, this information is obtainable through discovery from Defendants.

**Existence of Common Questions of Law and Fact: Fed. R. Civ. P. 23(a)(2) and 23(b)(3)**

17.     Common questions of law and fact exist as to all members of the proposed classes and predominate any and all issues of law and fact affecting individual members of the proposed classes. These issues include but are not limited to:

(a) Whether class engines were defectively designed or manufactured, including workmanship and materials, so as to subject the engine to premature failure of the oil pump;

(b) Whether class engines sustained damage directly or indirectly by premature failure of the oil pump;

(c) Whether class vehicles were sold with an owner's manual and/or Service and Warranty Information pamphlet and other materials that incorporated incorrect inspection and service intervals for the engine oil pump;

(d) Whether Defendants breached their express warranties (including but not limited to the powertrain-limited warranty) in that class vehicles were defective with respect to engine oil pump design and manufacture, including workmanship and materials;

(e) Whether Defendants intentionally misrepresented and/or omitted material facts concerning the characteristics of class engines;

(f) Whether Defendants committed unfair and deceptive business act practices by failing to inform owners of class vehicles prior to purchase and/or during the post-sale express warranty period that the engine oil pump was defective and would fail shortly after the warranty period expired and potentially cause damage to the engine, and that this defect posed a significant safety hazard;

(g) Whether Defendants were unjustly enriched by their warranty breaches and deceptive and/or unfair conduct described in this complaint; and,

(h) Whether proposed class members are entitled to monetary damages and injunctive relief pursuant to Rule 23(b)(2).

**Typicality of Claims or Defenses of a Definable Class: Fed. R. Civ. P. 23(a)(3)**

18. The proposed class representatives' claims and defenses are typical of the claims and defenses of proposed class members. Class claims arise out of ownership or lease of class vehicles as defined in ¶ 15. There are no defenses to Plaintiffs' claims on the part of defendants that are unique or different from the proposed class.

**Adequate Representation: Fed. R. Civ. P. 23(a)(4)**

19. The proposed class representatives will fairly and adequately protect the interests of the proposed classes. The proposed class representatives' claims and the proposed class members' claims are so interrelated that the interests of the proposed class members will be fairly and adequately protected in their absence. In aggregate, the proposed class counsel have over 60 years of experience concentrating in complex automotive products liability litigation and have been appointed class counsel in multiple other class action proceedings. Neither Plaintiffs nor their attorneys have any interests that are contrary to or conflicting with the class members.

**Superiority of a Class Action: Fed. R. Civ. P. 23(b)(3)**

20.     Maintenance of a class action in one court is the most economical procedural device to litigate the class vehicle claims for class vehicle owners and Defendants.  Prosecution of separate actions by individual members of the class could create risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class as recognized by Fed. R. Civ. P. 23(b)(1)(A).

21.     Prosecution of separate actions by individual members of the class could create risk of adjudications with respect to individual members of the class which would, as a practical matter, be dispositive of the interests of the other members of the class who are not parties to the adjudications or substantially impair or impede their ability to protect their interests as recognized by Fed. R. Civ. P. 23(b)(1)(B).

22.     There is a substantial likelihood that Defendants will oppose this class action and will further act or refuse to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole impractical as recognized by Fed. R. Civ. P. 23(b)(2).

23.     Questions of law and fact common to members of the class predominate over any questions affecting any individual members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy as recognized by Fed. R. Civ. P. 23(b)(3).

**Class Engine Oil Pump Defects**

24.     If designed and manufactured correctly, the class engine oil pump should last a minimum of 150,000 miles in a modern automobile such as the class vehicles.  This is demonstrated by Defendants' Service and Warranty Information pamphlet and other materials   accompanying class vehicles, other engines manufactured by Defendants incorporating an oil pump which incorporates no schedule for maintenance or replacement of the oil pump unit, and performance of comparable competitor vehicles.

8

An engine oil pump is a low wear item and normally not subject to scheduled replacement or routine maintenance such as disc brake pads or filters.

25.     Class engines are predisposed to premature engine oil pump failures when the polycarbonate oil pressure control ring (which controls the variable pump pressure output) becomes embrittled due to repeated heating and cooling thermal cycles, electrochemical degradation and vibration.  Also contributing to premature pump failure are overly viscous engine oils caused by cold temperatures.  When the engine oil pump pressure control ring fractures, oil pressure is greatly reduced or drops to zero.  This occurrence causes engine damage or complete catastrophic failure.  *See* Figure 1, *infra,* depicting typical oil pump polycarbonate control ring failure.

26.     Despite the increased use of polycarbonate material in automotive applications to save weight and reduce costs, the limitations of polycarbonate material applications are well-known in the industry.  BMW exceeded the application limitation as constructed. *See also Armstrong v. BMW of North America*, LLC, 2025 WL 957889 (D.N.J. March 31, 2025) (premature failure of plastic coolant lines in BMW vehicles manufactured between 2017-2019) and *Eiger, et al. v. Bayerische Motoren Werke Aktiengesellschaft, et. al*., United States District Court for the District of New Jersey, C.A. No. 2:26-cv-00753-JKS-MAH (premature failure of polycarbonate oil filter housing in BMW vehicles manufactured between 2014-2021).

27.     BMW redesigned the B58 engine oil pump for mid 2021 model year class vehicle incorporating a metal oil pressure control ring thereby eliminating the pump failure point. *See* Figure 2, *infra,* depicting revised metal pressure control ring.

28.     Prior to manufacturing and then distributing a new part, Defendants perform substantial field inspections and quality review of vehicles in service to determine the root cause and diagnosis of a problem.  After these tasks are completed, Defendants prepare draft and final specifications prior to setting the revised part out to bid.  All of this takes at least eighteen months of lead-time under normal

circumstances.

29.    Given the lead time necessary to investigate class engine oil pump failures, redesign and/or retool and manufacture the updated components demonstrates Defendants were aware of defects in class engine oil pump as class vehicle production commenced.



BROKEN AND DISPLACED POLYCARBONATE OIL PRESSURE CONTROL RING

**FIGURE 1: CLASS ENGINE OIL PUMP WITH POLYCARBONATE PRESSURE CONTROL RING FAILURE**

30.    In order to lower production costs, BMW AG commenced phasing out all metal engine oil pumps in favor of inferior polycarbonate component parts in approximately 2011.  BMW NA has been concealing the problems with its polycarbonate engine parts since at least July 2015 when it

released Service Information bulletin SI B11 13 15 concerning a service action to inspect and replace polycarbonate oil filter housing on N20 engines. Service Information bulletin SI B11 13 15 (August 2015 revision) recites that "The plastic oil filter housing may fail and lead to an internal and/or external engine oil or coolant leak." *See* accompanying Exhibit 1. Most notably, this service action was not applicable to N20 engines equipped with a metal oil housing. "If vehicle is fitted with the aluminum oil filter housing (silver color) then take no further action. Do not replace any parts." *Id*.



**FIGURE 2: REVISED B58 ENGINE OIL PUMP WITH METAL PRESSURE CONTROL RING**

31.    The date of this service bulletin, comments on various web sites and the lead time necessary to investigate B46/B48 engine oil filter housings failures, redesign and/or retool and

manufacture the updated components demonstrates that Defendants knew and were aware of defects in polycarbonate oil filter housing in late 2013 or early 2014. In fact, this measure failed to correct the problem. Again, this bulletin demonstrates the Defendants were aware of the limitations of utilizing polycarbonate material in its engines.

**Tolling of the Limitations Period**

32. Defendants' fraudulent conduct tolls any applicable statutes of limitations since the fraudulent omissions concerning the true cause of failures in class vehicle oil pumps was inherently unknowable to Plaintiffs and the class given the technical nature of the class vehicle design and manufacturing defects, including materials and workmanship.

33. Class vehicle owners do not possess the requisite technical skills in automotive engineering to discern the design, manufacture, materials and workmanship defects in their vehicles or the requisite technical skills to surmise the proper vehicle maintenance and maintenance intervals for class vehicles, or the ability to take disassemble internal components and inspect them.

34. State consumer protection laws, together with the doctrine of equitable tolling and/or the discovery rule, toll the applicable statutes of limitations for all class vehicles because of Defendants' fraudulent conduct, including but not limited to concealment of class vehicle defects and omission of material facts.

35. Some proposed class members relied on Defendants' fraudulent omissions concealing the cause of class engine oil pump failures and therefore delayed bringing suit against Defendants. These omissions relate to the fact that, in reality, pumps were failing due to manufacture, materials and/or workmanship defects. Defendants, however, fraudulently attributed the failings of class vehicle oil pumps to other factors and/or exculpating conditions for which Defendants had no responsibility.

36. Defendants are estopped from asserting that statutes of limitations were running for the duration of time class members relied on Defendants' fraudulent omissions.

37.    Defendants are equitably estopped from asserting the statutes of limitations have run against the claims of class members.

**Further Allegations**

38.    Defendants fraudulently, intentionally, negligently and/or recklessly concealed from proposed class representatives and proposed class members the defects in class engine oil pumps even though Defendants knew or should have known of design, materials and manufacturing defects in class engines if Defendants had adequately tested the engines.

39.    Defendants had actual knowledge that design, manufacturing, materials and/or workmanship defects were causing extensive irreversible premature performance degradation in class engine oil pumps shortly after production of the class vehicles commenced which were substantially certain to fail.

40.    Defendants engaged in extensive field research and quality investigations and analysis before revising the specifications for the defective part, rebidding the new part and manufacturing and distributing the new part.  In addition, Defendants have and continue to be under a legal obligation pursuant to federal law to monitor defects that can cause a safety issue and report them within five (5) days of learning of them.  Defendants therefore assiduously monitor the NHTSA–ODI website and the complaints filed therein in order to comply with their reporting obligations under federal law.

41.    Knowledge and technical information concerning the oil pump defect was in the exclusive possession of BMW AG and BMW NA before Plaintiffs leased and/or purchased their respective vehicles.  This information was not provided to Plaintiffs and members of the class. Defendants' knowledge is evident for several reasons.

42.    BMW AG's routine pre-production testing and post-production monitoring are designed to expose defects including the oil pump defect that will increasingly manifest over time.  BMW AG operates a massive multi-departmental Quality Assurance ("QA") division headquartered in Germany

supporting the development of its vehicles and components.  BMW AG's QA division is integrated throughout its brands and works closely with BMW AG's development, procurement, product engineering, production and sales divisions.  Its management team strategically controls the QA activities of BMW brands.

43.    BMW AG's extensive quality control testing of its vehicles, including class vehicles, combined with its pre- and post-production monitoring of class vehicle performance and complaints, across its brands and divisions worldwide alerted BMW AG and BMW NA early on that class engine oil pumps were failing prematurely.

44.    As manufacturers of automobiles marketed and sold in the United States, BMW AG and BMW NA completed testing that exposed the existence of the oil pump defect, including a Failure Modes and Effects Analysis ("FMEA") and Design Validation Plan and Report ("DVP&R").  During DVP&R testing, class vehicle oil pumps were exposed to conditions that would have caused the oil pump defect to manifest.

45.    The purpose of FMEA is to define, based on known and established facts, potential risks of failures and rank them by severity, likelihood and ability to detect failure.  Any conditions resulting in failure, including those associated with oil pump failure would result in a "high risk" priority and draw additional analysis and validation testing during the FMEA and DVP&R phases.  Given the later reports of failures after sales, including those suffered by Plaintiffs as well as class members, these processes were designed to show the various modes of failure caused by the oil pump defect and confirm what Defendants already knew about its fragile polycarbonate oil pump control ring.

46.    The DVP&R phase includes comprehensive testing and other processes required to validate the durability of any design, and includes three basic types of testing: (i) bench scale; (ii) engine dynamometer; and, (iii) vehicle/field testing.

47.    Bench scale testing is component-specific, and is completed by the supplier in

14

coordination with the Original Equipment Manufacturer ("OEM") to establish the strict set of specifications and guidelines to ensure that the component will operate reliably and durably in foreseeable operating conditions. During this phase of testing, Defendants' oil pump was "bench tested"—i.e. set up on various machines to simulate certain operating extremities and conditions to confirm whether it meets the necessary specifications and guidelines set by the supplier in coordination with BMW AG. Oil pumps are tested for their durability and tolerance of vibrations at varying frequencies, as well as exposure to changes in temperature, all with the purpose of exposing vulnerabilities and defects within the oil pump and oil pump assembly. In discovery, Plaintiffs expect to receive documentation that BMW AG and BMW NA received detailed results of oil pump bench testing together with testing documents from the supplier which outline the operating limitations of Defendants' oil pumps and information describing potential risks associated with installation in class vehicles. Similarly, discovery is expected to show that bench testing of the oil pumps confirmed what BMW AG and BMW NA already knew about its class engine oil pump—that use of the polycarbonate oil pump was inappropriate because it was certain to prematurely fail.

48.     Engine dynamometer testing is one of the most important types of testing to ensure durability and performance of engines and their components, including the oil pump assembly. In the engine dynamometer test, the oil pump is installed on a complete engine and operated under extreme conditions such as maximum temperatures and/or excessive vibration. Engine dynamometer testing is intended to demonstrate engine robustness and reveal necessary improvement or flaws such as the oil pump defect. Oil pump durability and tolerance of extreme temperature changes are tested by, among other things, cycling the engine between full throttle and idling repeatedly, which would reveal the oil pump defect. Discovery is expected to confirm that engine dynamometer testing of the oil pumps revealed material stress, deformation, compromised performance resulting in oil pressure reductions or complete pump failure.

49.　　BMW AG and BMW NA tested their oil pump assembly in actual vehicles, both prototype vehicles and pre-production line vehicles, including specific engine and powertrain calibration and development.  In these tests, vehicles with the oil pumps are driven through a full range of conditions and extremities that are encountered once a vehicle is sold to the public.  These vehicle-specific development tests include mapping extreme engine operating conditions with high engine loads, which are the conditions manifesting the oil pump defect.  BMW AG testing is intended to simulate the equivalence of 10 years and 150,000 miles of vehicle operation and would have revealed the oil pump defect.  Vehicle testing also exposes the oil pump to hot and cold weather conditions to reveal thermal fatigue and different oil viscosities and the resulting pump failure.  Discovery will evidence that oil pumps in such in-vehicle testing either failed or clearly demonstrated the oil pump defect by fractures of the polycarbonate material and compromised performance resulting in reduction of engine oil pressure or complete failure.

50.　　The quality management system utilized by the BMW group is based on ISO 9001 standards.  These standards must be complied with to attain type approval for the manufacture and sale of Defendants' vehicles, and requires thorough documentation of the testing, testing procedures and outcomes, as well as the obligation to improve upon testing and quality standards based on prior testing and experience, which would include in-warranty failures, sales of service parts for out-of-warranty failures, and NHTSA complaints which individually or collectively would have revealed the oil pump defect.

51.　　Another form of pre-production statistical analysis BMW AG performed which would have revealed the defective class engine oil pump is Weibull analysis.  This analysis employees component life data and reliability metrics.  An additional source of Defendants' knowledge of the oil pump defect comes from the testing of oil pumps replaced under warranty and returned to Defendants for analysis and testing.  Because oil pumps are anticipated to last at least 10 years or 150,000 miles, any

part failing under class vehicle warranties is subject to additional scrutiny.  Given that oil pumps are also considered an emissions part covered by California's extended emissions warranty and standards, Defendants must examine, test, analyze and report failed oil pump assemblies under the California Air Resources Board defect reporting program.

52.    Another source of Defendants' knowledge of the oil pump defect and that it causes premature engine failure comes from consumer complaints made to BMW NA and authorized BMW dealers.

53.    Also, the existence of BMW NA Service Information bulletin evidences this prior knowledge, particularly with premature failures of the polycarbonate oil cooler with the predecessor N20 engines.  The referenced Service Information bulletins, Defendants' pre-production testing, pre-production design failure mode analysis, production design failure mode analysis performed by BMW AG and BMW NA, early consumer complaints made to BMW NA and its American network of authorized BMW dealers, aggregate warranty and replacement part data compiled from those dealers, repair orders and parts data received from the dealers, consumer complaints to dealers and testing performed in response to consumer complaints, *inter alia*, are all evidence that BMW AG and BMW NA were aware (or should have been aware) of the oil pump defect in class vehicle engines.  BMW AG and BMW NA fraudulently concealed the oil pump defect and safety risk from members of the proposed classes.  BMW AG and BMW NA knew, or should have known, that the oil pump defect was material to owners of the class vehicles and was not known or reasonably discoverable by members of the proposed class before they purchased class vehicles or before the warranties on their class vehicles expired.

54.    BMW AG and BMW NA had actual knowledge that design, manufacturing, materials and/or workmanship defects were causing the oil pump defect shortly after production of the class vehicles commenced.  BMW AG and BMW NA engaged in extensive field research, quality

investigation and analysis before designing and issuing specifications for the oil pump revisions, bidding/sourcing the pump and manufacturing and distributing the new part, which was intended to replace earlier defective housings.

55.     Defendants failed to inform class vehicle owners prior to purchase or during the express warranty period that their engine oil pumps were defective and would fail shortly after the express warranty period expired.  Defendants misrepresented by affirmative conduct and/or by omission and/or by fraudulent concealment the existence of defects in the class engine oil pump.

56.     Defendants also failed to inform class vehicle owners at the time of purchase that the oil pump in their class vehicle's engine had been inadequately tested prior to placing the car in production and the time of vehicle sale.  Furthe, Defendants failed to inform class vehicle owners that they needed to strictly adhere to recommended oil viscosities particularly in colder climates otherwise premature oil pump control ring failure would occur.

57.     Specifically covered by the class vehicle powertrain limited warranty are "all internal [engine] parts" including the engine oil pump.  This warranty promised to repair or replace covered defective class engine components arising out of defects in materials and/or workmanship for a period of 4 years or 50,000 miles, whichever occurs first for non-commercial purchasers.[3]

58.     Defendants knew shortly after class vehicle production commenced that the defective polycarbonate engine oil pump was experiencing premature failures.  Despite this knowledge, Defendants continued to sell class vehicles with defective polycarbonate oil pump that were defective. This knowledge is imputed to BMW AG because BMW NA was monitoring warranty claims and class vehicle performance in the United States, and reporting back to its parent located in Germany.

---

[3] Class vehicles were accompanied by a limited warranty "against defects in materials or workmanship" for "48 months or 50,000 miles, whichever occurs first" from "the date of first retail sale or the date the vehicle is first placed into service as a sales demonstrator.

59. The proposed class representatives and proposed class members had valid and binding warranties and contracts with Defendants and were reasonably expected by Defendants to use their respective class vehicles in the manner in which passenger motor vehicles were used.

60. The proposed class representatives and proposed class members complied with all warranty and contractual obligations including all warranty, warranty notice, maintenance and product use obligations for their respective class vehicles. The proposed class representatives and proposed class members operated their class vehicles under normal anticipated conditions in noncommercial environments.

61. Defendants timely received notice of their breach of warranty claims through their authorized BMW representatives contacted by proposed class representatives and have suffered no resulting prejudice. Moreover, the proposed class representatives contacted BMW NA directly and/or through an authorized dealership.

62. Proposed class representatives were informed by a representative of BMW NA that BMW NA would not provide assistance in repairing class engine oil pumps because the vehicles were outside of the express warranty period.

63. Defendants refused to fully reimburse or compensate the proposed class representatives for vehicle repair expenses or provide a suitable substitute or replacement vehicle. Although their vehicles' oil pump failure occurred outside the unilateral express warranty period (the length of which was not bargained for prior to purchase), the proposed class representatives' class vehicles exhibited unmistakable symptoms (known only by Defendants) of degradation and impending premature failure within the express warranty period.

64. Despite actual and constructive knowledge of class vehicle defects as described in this complaint, Defendants failed to cure class vehicle defects within the express warranty period and thereby breached the terms of the express warranty.

19

65.    Through no fault of their own, the proposed class representatives and proposed class members did not possess sufficient technical expertise to recognize symptoms of impending oil pump failure.  This information, however, was well known to Defendants at the time of class vehicle purchase, but not revealed.  Plaintiffs were also unaware of NHTSA databases concerning dissemination of Service Information bulletins for class engine oil pumps.

66.    The proposed class representatives relied upon material misrepresentations, fraudulent statements and/or material omissions of employees and agents of Defendants at the time of purchase, including but not limited to the useful and expected life of class vehicles and the recommended class vehicle maintenance program.

67.    Defendants' misrepresentations and omissions were received by the respective proposed class representatives prior to and at the point of their class vehicle purchase.[4]  These representations were made by BMW authorized dealers referencing publications concerning class vehicles including the owner's manual and the Service and Warranty Information pamphlet and other materials.  The representations created a reasonable belief the useful life expectancy of class vehicles without a major engine failure was in excess of 150,000 miles.  These representations specifically related that the engine oil pump were non-maintenance engine lifetime components.

68.    Defendants actively concealed the defective nature of the class vehicles' oil pump from the proposed class representatives and all class vehicle purchasers.  Defendants intentionally failed to inform class vehicle purchasers that class vehicles incorporated a defective and/or improperly tested oil pump that would prematurely fail well before the reasonably expected useful life of the vehicle.

69.    Defendants intentionally failed to inform class vehicle purchasers that the oil pump

---

[4] For class vehicles purchased used from private sellers or nonauthorized BMW dealers, there were multiple methods the Defendants could have communicated with these purchasers concerning the defective class engine oil pump.

incorporated in class vehicles results in higher operational costs than alternative conventional oil pump or other competitive technology because the oil pump prematurely fails well before the reasonably expected useful life of the vehicle.

70.    Defendants actively and fraudulently concealed the existence of class vehicle material, manufacture and/or design defects (including defects covered under class vehicle warranties concerning materials and workmanship) and that the owner's manual and Service and Warranty Information pamphlet accompanying class vehicles incorporated improper maintenance recommendations and maintenance intervals.

71.    Proposed class representatives and class members did not discover that the oil pump in their respective class vehicle was defective until after their respective oil pump failed.

72.    Defendants' customer service telephone representatives made false and fraudulent representations to class members as to the cause and existence of oil pump defects in class vehicles although the service representative received hundreds of consumer complaints that this part prematurely failed.  Defendants' employees falsely represented certain conditions for which Defendants were not responsible as the basis for the failures that were in fact caused by a defect in materials, manufacturing and design.  Defendants falsely stated that they were not responsible for the resulting class vehicle failures and/or denied the existence of known pump defects.

73.    Authorized BMW dealers did not have knowledge of and/or were counseled not to admit that any defects existed in class vehicles or that improper maintenance recommendations were incorporated in the owner's manual and Service and Warranty Information pamphlet.  BMW dealers (who also had a vested financial interest in concealing and suppressing the actual cause of class vehicle failures) improperly blamed vehicle failures on certain conditions for which Defendants would not be responsible and/or denied the existence of defects in the oil pump.

74.    Defendants had actual knowledge, constructive knowledge and/or should have known,

21

upon proper inquiry and testing, that class vehicles were defective with respect to their oil pump, suffered from extensive irreversible premature performance degradation during the warranty period and did not have a normal and/or reasonable useful life before sales of class vehicles commenced in the United States. This information was technical in nature, proprietary and not known by the ordinary consumer or the public, including the proposed class representatives and proposed class members. Proposed class representatives and proposed class members were ignorant of this technical information through no fault of their own.

75. Defendants acted to conceal the oil pump defects during the warranty period so that repair costs would be shifted to the proposed class representatives and proposed class members once the warranty expired and the oil pump failed.

76. Although Defendants knew that defects in class engines caused premature oil pump failure, Defendants knowingly and actively concealed material information from prospective purchasers and actual purchasers with the intent to deceive purchasers and promote class vehicle sales.

77. Defendants' aggregate knowledge of class engine oil pump defects was further derived from warranty claims, field investigations, claims supervisors, customer complaints and monitoring of performance of class vehicles by BMW NA quality assurance employees.[5] Additionally, the number of replacement components and subsequent component revisions would have placed Defendants on notice of class vehicle defects. Knowledge of class vehicle engine oil pump defects is further imputed to Defendants prior to sale of year class vehicles because predecessor models using substantially similar polycarbonate material to construct engine parts that were also prematurely failing within their reasonably expected life. Defendants elected to place into the stream of commerce class vehicles that they knew would be adversely affected by the failure to adequately design and manufacture the oil pump.

---

[5] Additional aggregate knowledge was derived from monitoring BMW enthusiast websites such as bimmerfest.com and bimmerpost.com from which BMW NA obtains marketing information.

78.     Additional information supporting allegations of fraud and fraudulent conduct is in the control of Defendants.  This information includes but is not limited to technical root cause analyses, communications with class vehicle owners, remedial measures, warranty claims and internal corporate communications concerning how to deal with consumers who claim their class engines' oil pump were defective.

79.     Material information fraudulently concealed and/or actively suppressed by Defendants includes the defects described in the preceding paragraphs.

80.     Material information was fraudulently concealed and/or actively suppressed in order to sell class vehicles to uninformed consumers (including the proposed class) premised on affirmations and representations of reliable, high quality, long-life vehicles with low maintenance, inexpensive operating costs, superior performance and durability.  In fact, class vehicles actually contained a known oil pump defects that would severely affect the useful life of the vehicle.

81.     Defendants (and particularly the sales and marketing executives at BMW NA) advertised and otherwise created the reasonable expectation (including but not limited to scheduled class engine maintenance recommendations) that class vehicles would last over 150,000 miles or ten years before experiencing oil pump failure.  Material information was fraudulently concealed and/or actively suppressed in order to protect Defendants' (and authorized vehicle dealers') corporate profits from loss of sales from adverse publicity, to reduce warranty repair costs and to limit BMW's brand disparagement.

82.     Defendants had a duty to disclose to class vehicle owners that there were materials and manufacture defects in class vehicles and that the owner's manual and Service and Warranty Information pamphlet set forth the wrong maintenance recommendations and maintenance intervals.

83.     The information was material to a reasonable consumer, because, had Plaintiffs and class members been told the concealed information concerning the defective oil pump, they would not have

purchased their class vehicles or would have not purchased them at the price paid.

84.     This duty arose because Defendants knew that there were defects in the vehicles and inaccuracies in the owner's manual and Service and Warranty Information pamphlet that affected vehicle operation and safety with respect to the oil pump.  Failure of a class vehicle engine oil pump could unexpectantly cause engine seizure due to absence of oil pressure.  Loss of engine power unexpectedly would result in a loss of vehicle control, inability to accelerate or maintain speed placing the vehicle at risk for a rear end collision.  Loss of engine power also affects vehicle power steering and vehicle braking.  Class vehicle owners were not, and could not reasonably be, cognizant of these defects and dangers because they were not informed of the oil pump defect.  A reasonable consumer would consider the engine oil pump defect material because of risk of physical injury.

85.     Defendants continuously and affirmatively concealed the actual characteristics of class vehicles from the proposed class representatives and other purchasers.  Defendants breached their affirmative duty of disclosure to class vehicle owners (and particularly to owners who inquired as to the cause of class vehicle engine oil pump failures).[6]

86.     Defendants breached express and implied warranties and actively and affirmatively misrepresented, fraudulently concealed and suppressed, both pre-sale and post-sale, the existence of defects in class vehicles and omissions in accompanying owner's manual and Warranty and Maintenance pamphlet.

87.     The warranties accompanying class vehicles were procedurally and substantively unconscionable under the Uniform Commercial Code § 2-302 and other applicable state warranty laws because of the disparity in bargaining power of the parties, the purchasers' lack of knowledge that class

---

[6] Since unexpected class engine failure either by seizure caused by low or no oil pressure is a serious unreasonable safety issue particularly on limited access roads, Defendants had an affirmative duty to disclose vehicle engine defects together with associated risks specifically where vehicle purchasers and operators were unaware of the oil pump defect.

vehicles were defective, the inability of class vehicle purchasers to bargain with Defendants to increase durational warranties, their lack of knowledge of the defect, their lack of meaningful alternatives, disparity in sophistication of the parties, unfair terms in the warranty (including but not limited to durational warranties that unfairly favored Defendants particularly where there were class vehicle defects known only to Defendants and the warranty unfairly shifted repair costs to consumers when class vehicles prematurely fail during their reasonably expected life), absence of effective warranty competition and the fact that class vehicles fail with substantially fewer miles of operation than competitive vehicles from other manufacturers or models identical to class vehicles.

88. Purchasers of class vehicles reasonably expect vehicles to function well in excess of the class vehicles' durational warranties before requiring extensive expensive repairs. This is particularly true where the purchasers of class vehicles were led to believe by Defendants' representations and typical consumer expectations in a commercial context that the useful expected life of the oil pump was in excess of 150,000 miles and there was no scheduled inspection or maintenance for the oil pump within this period.

89. Given the conduct of Defendants and the manufacture, materials, design and workmanship defects in class vehicles (that Defendants knew were inherently defective prior to the time of sale as well as post-sale), the durational limitations of the warranties are oppressive, unreasonable and unconscionable because the warranty disclaimers of the proposed class representatives and proposed class members were neither knowing nor voluntary.

90. The proposed class representatives and proposed class members had an absence of any meaningful choice in the contractual terms which were unreasonably favorable to Defendants since Defendants were fully aware of defects in the class vehicles that substantially reduced the expected useful life of the vehicle engine components. The proposed class representatives and proposed class members were unaware of defects in the class vehicles at the time of purchase.

25

91.     The bargaining position of Defendants for the sale of class vehicles was grossly disproportionate and vastly superior to that of individual vehicle purchasers, including the proposed class representatives and proposed class members.  This is because Defendants knew there were defects in class vehicles affecting durational operation and operating costs.

92.     Defendants included unfair contractual provisions concerning the length and coverage of the express warranty when they knew that class vehicles were inherently defective and dangerous and had been inadequately tested.

93.     Defendants knew defects in class vehicle components would cause certain expensive repair failures within one-half of the useful expected life of the vehicle engine.  Defendants artificially limited the duration of the warranty period to avoid performing warranty repairs in order to maximize profits through the sale of defective vehicles.

94.     Defendants unconscionably sold defective class vehicles to the proposed class representatives and proposed class members without informing these purchasers that the class vehicles were defective.  In the alternative, Defendants failed to notify the proposed class representatives and proposed class members after the time of sale that the oil pump had been redesigned and that the assemblies in their respective vehicles should be replaced prior to the expiration of the warranty.

95.     Defendants' conduct renders the vehicle purchase contract so one-sided as to be unconscionable under the circumstances existing at the formation of the vehicle purchase contract.

96.     The durational limitation of the express warranties accompanying the class vehicles is unreasonable and unconscionable since Defendants actively concealed known vehicle defects and issued incorrect maintenance recommendations and maintenance intervals.  The proposed class representatives and proposed class members had no notice of or ability to detect the defects.

97.     Defendants restricted the limited power train warranty (including the class engine) duration to 4 years or 50,000 miles (whichever occurs first) for class vehicles in an effort to avoid the

26

cost of repairs because they were cognizant of class vehicle defects that existed at the time of sale particularly including the engine oil pump.

98. Engines in competitive vehicles manufactured and sold at the time the class vehicles were manufactured and sold ordinarily last longer than warranted by the limited power train warranty accompanying class vehicles.

99. Defendants engaged in unconscionable fraudulent commercial practices and attempted to conceal class vehicle materials defects, workmanship defects, manufacturing defects, and improperly recommended maintenance.

100. Defendants are engaged in a continuing fraud concerning the true underlying cause of class vehicle engine oil pump failures.

101. Defendants failed to adequately test class vehicles in appropriate consumer environments prior to marketing, distribution and sale.

102. Defendants' unconscionable conduct precludes any exclusion of incidental and consequential damages or any other limitation of remedies. Defendants' upper-level management orchestrated this wrongful conduct.

103. The proposed class representatives and proposed class members operated and maintained their class vehicles in conformity with the respective owner's manual and Service and Warranty Information pamphlet and provided the requisite notice to Defendants' authorized agents for warranty repair after their class vehicles failed.

104. Even if class vehicle engines do not fail entirely, class vehicle owners have sustained an ascertainable financial loss, including but not limited to increased maintenance costs for oil pump inspections and/or premature replacement of the oil pump and/or substantially reduced engine performance. Individuals who own or have owned class vehicles also sustained diminution of the resale value of their class vehicles since knowledge of problems with class vehicles became public information

after the time of their purchase.

105.    The proposed class representatives and proposed class members have not received the benefit of their bargain concerning their respective purchase of class vehicles.

106.    Defendants created an overall misleading impression through their failure to disclose material information concerning the fact that class vehicles incorporated defective oil pump and were accompanied by an owner's manual and Service and Warranty Information pamphlet that incorporated incorrect engine service and maintenance recommendations.  The proposed class representatives and proposed class members were likely to be deceived and were in fact deceived by Defendants' conduct as described in this complaint with respect to their purchase of class vehicles.

107.    Defendants violated the consumer protection laws of New Jersey and Florida with their oppressive and unconscionable conduct described in this complaint including but not limited to their failure to disclose material information that caused ascertainable financial harm to proposed class representatives and proposed class members.

108.    Defendants were under a duty to disclose class vehicle safety defects as described in this complaint but failed to disclose to proposed class representatives and proposed class members the characteristics of class vehicles with respect to defects in violation of the consumer protection laws of New Jersey and Florida together with all other state consumer protection laws.  Defendants' knowing omissions (that class engines were defective and that this defect constituted a safety hazard) deceived purchasers (including but not limited to proposed class representatives and proposed class members). Those knowing disclosure omissions include the fact that class vehicle engine defects had a significant impact on the value, durability and future care of class vehicles.  This failure to disclose additional information concerning class vehicle defects had the capacity to, and in fact did, deceive purchasers (including but not limited to proposed class representatives and proposed class members) in a material respect.

109. If proposed class representatives and proposed class members had been made aware of the defects in their respective class vehicles and the attendant ramifications of value, durability, maintenance expenses, safety and care, they would not have purchased the class vehicles or would have paid less for their vehicles since class members were led to believe that they were purchasing a vehicle that was free of major defects and were not fully informed of the true characteristics and attributes of class vehicles.

110. Defendants fraudulently, intentionally, negligently and/or recklessly concealed from proposed class representatives and proposed class members defects in class vehicles even though Defendants knew information concerning these defects was material and central to the marketing and sale of class vehicles to prospective purchasers including proposed class representatives and proposed class members.

111. As a direct result of these knowing omissions, proposed class representatives and proposed class members purchased class vehicles and sustained economic harm since they purchased vehicles worth considerably less than represented. These misrepresentations diminish the value and cost of vehicle ownership while also increasing risk of injury that was not disclosed to or reasonably anticipated by consumers at the time of purchase.

**What the Omissions were**

112. Defendants fraudulently omitted to disclose material facts (including safety risks and unanticipated costly repairs incurred in replacing the pump) basic to both the purchase and warranty service concerning class vehicles, including information concerning class engine oil pump defects, in an effort to deceive purchasers as described in this complaint. At the time of purchase, Defendants fraudulently omitted to disclose material matter regarding the defects in class vehicles, including their impact on future repairs, costs and vehicle reliability. Defendants fraudulently concealed from the proposed representatives and proposed class members defects in class vehicles even though Defendants

knew or should have known that information concerning these defects was material and central to the marketing and sale of class vehicles to prospective purchasers, including proposed class representatives and proposed class members.

113.    Defendants concealed from proposed representatives and proposed class members during their warranty periods that a defect existed with the oil pump which could have and should have been fixed during the warranty period, particularly as it was a safety issue, and Defendants' withholding of this material information deprived proposed representatives and proposed class members of the right to have such defective part replaced for free under the warranty.

**The Person(s) Responsible for the Failure to Disclose**

114.    The proposed class representatives and proposed class members are entitled to the reasonable inference that Defendants' sales, marketing, engineering and warranty departments and their executives were involved in the omissions.

**The Context of the Omissions and the Manner in which they Misled**

115.    Material information was fraudulently concealed and/or actively suppressed in order to sell class vehicles to uninformed consumers (including proposed class representatives and proposed class members) premised on affirmations and representations as described in this complaint.

116.    If proposed class representatives and proposed class members had been informed of defects in their class vehicles, they would not have purchased their respective class vehicles or would have paid substantially less.  If proposed class representatives and proposed class members had been made aware of the defects in their respective class vehicles and the attendant ramifications of their respective vehicle's diminution in value, future cost of repairs, durability and care, they would not have purchased the class vehicles since each class member believed they were purchasing vehicles without major defects and were not fully informed of true characteristics and attributes of class vehicles.  If the proposed class representatives and proposed class members had been informed of the defect during the

warranty period, they would have had the defective part replaced under warranty. Defendants' conduct that violated the consumer fraud statutes alleged herein deprived proposed representatives and proposed class members of that remedy.

**What Defendants Obtained through the Fraud**

117. Material information concerning class vehicles was concealed and/or actively suppressed in order to protect Defendants' corporate profits from loss of sales, purchase refunds, warranty repairs, adverse publicity and limit brand disparagement. Purchasers believed they were obtaining vehicles as having different attributes than described and purchased and were accordingly deprived of economic value and paid a price premium for their class vehicles. Defendants had a uniform policy of not properly disclosing class vehicle defects in order to promote sales and increase profits as described in this complaint.

118. As a proximate and direct result of Defendants' unfair and deceptive business trade practices, proposed class representatives and proposed class members purchased class vehicles and sustained an ascertainable loss, including but not limited to financial harm as described in this complaint.

**COUNT I**
**BREACH OF UNIFORM COMMERCIAL CODE § 2-313: EXPRESS WARRANTY OF**
**MERCHANTABILITY BY THE DEFENDANTS RESULTING IN FINANCIAL HARM**
(on behalf of the New Jersey and Florida classes)

119. The proposed class representatives and proposed class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

120. Defendants are merchants with respect to passenger motor vehicles. Class vehicles are goods within the meaning of the Uniform Commercial Code as adopted by New Jersey and Florida.

121. Defendants provided class members an express powertrain limited warranty of "4 years or 50,000 miles whichever occurs first, from date the vehicle was first placed in service." Specifically covered by this powertrain-limited warranty were "all internal [engine] parts" including the engine oil

31

pump.  This warranty promised to repair or replace covered defective class engine components arising out of defects in materials and/or workmanship for a period of 4 years or 50,000 miles, whichever occurs first for non-commercial purchasers.

122.    Defendants expressly warranted to the general public, owners and lessees of class vehicles that class vehicles were merchantable and fit for the ordinary purposes for which passenger vehicles are used.  Defendants are merchants with respect to passenger motor vehicles.  The proposed class representatives and proposed class members purchased their respective vehicles for personal, family, and/or household use and did not engage in commercial use of their vehicles.

123.    The proposed class representatives and proposed class members were not presented with an opportunity to review (let alone bargain for) the warranty provisions at the time of purchase of their class vehicles and were unaware of the defects in the oil pump of class vehicle engines that made the respective bargaining position of the parties unequal at the time of vehicle purchase.

124.     Defendants received adequate notice of their breach of their express warranties and failed to cure the warranty breaches.  The proposed class representatives and class members reported to Defendants the problems with and failings of the oil pump in their vehicles and requested Defendants that they cure and/or repair and/or replace the defective oil pumps.  In the alternative, the proposed class representatives, as indirect purchasers, were not required to issue notice of the warranty breach to Defendants and the lack of notice of warranty breach did not result in any prejudice to Defendants.

125.    The proposed class representatives and proposed class members complied with maintenance recommendations for their respective class vehicle.

126.    Defendants failed to remedy by replacement or repair the proposed class representatives' oil pumps that were defective in materials and workmanship during the express warranty period although

these defects were known to Defendants at that time.[7]  Class vehicles owned by the proposed class representatives and proposed class members also prematurely failed and/or experienced substantial performance diminution within the express warranty period of 4 years or 50,000 miles.

127.    Because of the oil pump defects, class vehicles are not reliable and owners of these vehicles have lost confidence in the ability of class vehicles to perform the function of safe reliable transportation.

128.    The proposed class representatives and proposed class members could not have reasonably discovered the defective condition of their class vehicle engines prior to failure.

129.    The express warranty remedy set out in the warranty provisions accompanying class vehicles fails of its essential purpose under Uniform Commercial Code § 2-719(2) and the limitation of consequential damages is unconscionable under § 2-719(3) because of the conduct of Defendants described, *supra*.

130.    Defendants breached their express warranties in that class vehicles were defective with respect to engine materials, workmanship, and manufacture.  Defendants further breached their express warranties in that class vehicles were accompanied by an owner's manual and Service and Warranty Information pamphlet that incorporated no inspection and service intervals for the oil pump although Defendants knew these components were defective and required periodic inspection and service.

131.    Defendants further breached their express warranties by failing to remedy the oil pump defects caused by defects in materials and workmanship as required by the warranty accompanying class

---

[7] The Service and Warranty Information materials for class vehicles recites as follows:

> To obtain warranty service coverage, the vehicle must be brought, upon discovery of a defect in material or workmanship, to the workshop of any authorized BMW SAV center in the United States or Puerto Rico, during normal business hours.  The authorized BMW SAV center will, without charge for parts or labor, either repair or replace the defective part(s) using new or authorized remanufactured parts.

vehicles.

132. The proposed class representatives and proposed class members relied on express warranties directly issued to them by Defendants concerning class vehicles and sustained financial injury resulting from the breach of those warranties by Defendants including replacement of the engine oil pump and repair of resulting engine damage.

133. The proposed class representatives and proposed class members could not have reasonably discovered the defective condition of the class vehicles. Defendants' breach of their express warranties was the direct and proximate cause of the proposed class members' financial harm.

134. Proposed class representatives and proposed class members request judgment against Defendants for multiple damages, interest, costs and attorneys' fees.

**COUNT II**
**BREACH OF UNIFORM COMMERCIAL CODE § 2-314: IMPLIED**
**WARRANTY OF MERCHANTABILITY BY THE DEFENDANTS**
(on behalf of the New Jersey and Florida classes)

135. The proposed class representatives and proposed class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

136. Defendants are merchants with respect to passenger motor vehicles. Class vehicles are goods within the meaning of the Uniform Commercial Code as adopted by New Jersey and Florida.

137. Defendants failed to provide legally binding written notice to proposed class representatives and other class vehicle purchasers of implied warranty exclusions at time of purchase because the warranty exclusion failed to mention merchantability and was not conspicuous within the meaning of § 2-316 and was therefore ineffective as a matter of law.

138. Defendants impliedly warranted to the general public, owners and lessees of class vehicles that the class vehicles were merchantable and fit for the ordinary purposes for which passenger vehicles are used. The proposed class representatives and proposed class members purchased their

34

respective vehicles for personal, family, and/or household use and did not engage in commercial use of their vehicles.

139.    As manufacturers of consumer goods, Defendants are precluded from excluding or modifying an implied warranty of merchantability or limiting consumer remedies for breach of implied warranty.

140.    To the extent privity of contract is required for purposes of the application of implied warranty, the proposed class representatives and proposed class members are third-party beneficiaries to a contract implemented by Defendants that creates an implied warranty of merchantability.

141.    Defendants breached their implied warranties in that class vehicles were defective with respect to engine design and manufacture as described in this complaint and were unfit for the ordinary purposes for which passenger vehicles are used because of those defects which caused premature oil pump failure and consequent damage to the engine.

142.    Class vehicles are predisposed to premature failure in normal anticipated operating environments because of materials, workmanship and manufacture defects described in this complaint that existed at the time these vehicles were constructed.

143.    Class vehicles are not reliable and owners of these vehicles have lost confidence in the ability of class vehicles to perform the function of safe reliable transportation without the likelihood of unanticipated sudden catastrophic engine failure.  Defendants are estopped by their conduct, as described in this complaint, from disclaiming any and all implied warranties with respect to the oil pump in class engines.

144.    Proposed class representatives and proposed class members relied on implied warranties of merchantability made by Defendants concerning class vehicles in choosing to purchase their respective class vehicles and sustained an ascertainable financial injury resulting from the breach of those warranties by Defendants.

145.    Defendants received adequate notice of their breach of the implied warranty of merchantability through proposed class representatives and proposed class members' requests for repair or replacement.  In the alternative, class vehicle owners, as indirect purchasers, were not required to issue notice of the warranty breach to Defendants and any lack of notice of warranty breach did not result in any prejudice to Defendants.  Defendants declined to offer the proposed class representatives an effective remedy for their defective class engine or vehicle.

146.    Even though the proposed class representatives and proposed class members complied with class vehicle engine maintenance recommendations for their respective class vehicles, their respective class vehicle engines prematurely failed because of defects in the oil pump.

147.    Proposed class representatives and proposed class members reasonably relied upon the expertise, skill, judgment and knowledge of Defendants and upon their implied warranty that class vehicles were of merchantable quality and fit for their intended use.  Class vehicles did not conform to Defendants' implied representations or warranties because defects in the oil pump caused class engines to be less reliable and more expensive to maintain than competitor vehicles.

148.    Proposed class representatives and proposed class members had an independent legitimate consumer expectation that the class vehicles would last well in excess of 10 years and 150,000 miles before requiring any major engine repairs based on industry standards, Defendants' publications and other publications, competitor products, consumer product magazines, prior vehicle ownership and reputation of Defendants for manufacturing durable quality vehicles. There were no statements made by Defendants or their agents that contradicted or caused consumers to lower their legitimate expectations at the time of purchase.

149.    The proposed class representatives and proposed class members could not have reasonably discovered the defective condition of the class vehicles because the class engine defects were hidden.  Defendants' breach of their implied warranties of merchantability was the direct and proximate

36

cause of proposed class representatives' and proposed class members' financial harm. Had the class vehicles not contained defective and failing oil pump, proposed class representatives and proposed class members would not have incurred the costs of engine repair.

150.   Proposed class representatives and proposed class members request judgment against Defendants including multiple damages, interest, costs and attorneys' fees.

**COUNT III**
**VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT ("NJCFA")**

(on behalf of Gardella and the New Jersey class)

151.   Proposed New Jersey class representative Gardella and proposed New Jersey class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

152.   Gardella asserts this count on behalf of himself and members of the New Jersey class.

153.   The NJCFA states in pertinent part as follows:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .
>
> N.J.S.A. § 56:8-2.

154.   Defendants are each a "person" as defined by the NJCFA. N.J.S.A. § 56:8-1(d).

155.   The purchase or lease of class vehicles by Gardella and New Jersey class members constituted "merchandise" as defined by the NJCFA. N.J.S.A. § 56:8-1 and § 56:8-2.

156.   By knowingly concealing the defective nature of the class vehicles to Gardella and New Jersey class members, Defendants violated the NJCFA, because such information was a material fact that a reasonable consumer would want to know and the omission thereof was material to a reasonable

37

consumer.

157.    Defendants represented that the class vehicles had characteristics and benefits they do not possess and represented that the class vehicles were of the highest standard, quality, or grade for a luxury vehicle when they were of another.

158.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' course of trade or business, were material, were capable of deceiving a substantial portion of the purchasing public caused resulting economic harm to owners and purchasers of class vehicles.

159.    Defendants knew shortly after production of class vehicles commenced that class vehicles' engine oil pump suffered from an inherent defect and would exhibit problems such low engine oil pressure or complete failure and were not suitable for their intended use.

160.    Defendants had exclusive knowledge of material facts concerning the existence of the defective engine oil pump in its class vehicles. Yet, Defendants actively concealed this defective oil pump from consumers at and prior to the time of purchase and failed to offer class members a permanent solution to the defect.

161.    Defendants were under a duty to Gardella and New Jersey class members to disclose the defective nature of the oil pump as well as the associated costs that would have to be expended in order to repair or replace the defective oil pump.

162.    Defendants were in a superior position to know the true state of facts about the defective oil pump in the class vehicles;

163.    Gardella and New Jersey class members could not reasonably have been expected to learn or discover that the class vehicles had a defective oil pump until the pump failed.

164.    Defendants knew that Gardella and New Jersey class members could not reasonably have been expected to learn or discover the defective oil pump prior to its manifestation.

165.    Defendants knew or should have known that their conduct violated the NJCFA.

38

166.    In failing to disclose the defective nature of the class vehicles, and/or denying and misleading as to the true cause and remedy of the oil pump failure, Defendants knowingly and intentionally concealed material facts and breached their duty to not do so.

167.    The facts Defendants concealed from Gardella and New Jersey class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease a class vehicle.  Moreover, a reasonable consumer would consider the defective oil pump to be an undesirable quality as Gardella and New Jersey class members did.  If Gardella and New Jersey class members had known that the class vehicles had the oil pump defect, they would not have purchased or leased a class vehicle, or would have paid less.

168.    Gardella and class members, like all objectively reasonable consumers, did not expect the oil pump to prematurely fail prior to 150,000 miles.

169.    As a result of Defendants' misconduct, Gardella and New Jersey class members have been harmed and suffered ascertainable damages and actual compensatory damages including that Gardella and New Jersey class members would not have purchased their vehicles for the price paid, or would not have purchased them at all had they known of the material defective oil pump and as a result, paid an unconscionable, illegal and improper price premium which they would not have paid, diminution of value and payment of the cost of repairs.

170.    As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Gardella and New Jersey class members suffered and will continue to suffer ascertainable losses in that they have experienced and may continue to experience their class vehicles' oil pump prematurely failing causing physical damage for which they must pay out-of-pocket to remediate.

171.    Defendants' violations present a continuing safety risk to Gardella and New Jersey class members and to the general public.  Defendants' unlawful acts and practices described in this complaint affect the public interest.

172.    Pursuant to N.J.S.A. § 56:8-2, Gardella and New Jersey class members request actual and statutory damages, attorneys' fees and expenses, treble damages, and punitive damages as permitted under the NJCFA and applicable law.

**COUNT IV**
**VIOLATIONS OF FLORIDA DECEPTIVE AND UNFAIR**
**TRADE PRACTICES ACT ("FDUTPA")**
(on behalf of Renwick and the Florida class)

173.    Proposed Florida class representative Renwick and proposed Florida class members incorporate by reference all allegations in the above preceding paragraphs as if set forth fully in this count.

174.    Proposed Florida class representative Renwick and proposed Florida class members assert this count on behalf of themselves and members of the proposed Florida class.

175.    Renwick brings this action against Defendants on behalf of himself and the Florida class.

176.    Renwick is a consumer within the meaning of FDUTPA, Fla. Stat. § 501.203(7).

177.    Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

178.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1).  Defendants participated in unfair and deceptive trade practices that violated the FDUTPA, as described in this complaint.

179.    In the course of their business, and as set forth in this complaint, Defendants enticed consumers to purchase the class vehicles in their defective state, without advising Renwick or Florida class members of the engine oil pump defect.  Defendants knowingly omitted the material facts concerning the defect.  After accepting Renwick's and Florida class members' money, and after receiving numerous complaints and repair requests, Defendants failed to issue a recall, service action or

40

reimburse Renwick and Florida class members for their defective engine oil pump repairs.

180.  Defendants violated the FDUTPA by, at a minimum employing deception, deceptive acts or practices, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the class vehicles.

181.  Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated FDUTPA by marketing the class vehicles but failing to ensure that consumers actually received non-defective class vehicles.

182.  Defendants' unfair and deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Renwick and Florida class members.

183.  Renwick and Florida class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and/or omissions.  Renwick and Florida class members would not have purchased a class vehicle, or alternatively, would have purchased the class vehicle at a discounted price, had they been aware of Defendants' unfair and deceptive acts or practice relating to the defective oil pump and as a result, paid an unconscionable, illegal and improper price premium which they would not have paid.

184.  Renwick and Florida class members are at risk of irreparable injury as a result of Defendants' acts and omissions in violation of FDUTPA, which violations present a continuing risk to Renwick and Florida class members.

185.  As a direct and proximate result of Defendants' violations of FDUTPA, Renwick and Florida class members suffered injury-in-fact and/or actual damage, to be further determined at trial, including but not limited to diminution of value and the cost of repair including the damage caused by the oil pump defect.

186.  Renwick and Florida class members are entitled to recover their actual damages under

Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

187.    Renwick would consider purchasing another class vehicle if BMW were to fix the problem for other vehicles and, therefore, although Renwick would like to purchase another BMW vehicle in the future, she is unable to rely on Defendants' current advertising and representations and is left to guess if they are or will provide a vehicle without the defect.

## COUNT V
## UNJUST ENRICHMENT
(on behalf of the New Jersey and Florida classes)

188.    Renwick and Gardella and the unjust enrichment classes hereby incorporate by reference all allegations in the preceding paragraphs as if set forth fully in this count.

189.    The warranty had value which Plaintiffs paid, and for which Defendants agreed to render services of repair and replace.

190.    Defendants breached their implied and express warranties in that class vehicles were defective with respect to engine materials, workmanship, and manufacture.  Defendants further breached their express and implied warranties in that class vehicles were accompanied by an owner's manual and Service and Warranty Information pamphlet that incorporated incorrect inspection and service intervals. Class vehicles were not of merchantable quality and were unfit for the ordinary purposes for which passenger vehicles are used because of engine materials, workmanship, and manufacture defects and an owner's manual and Service and Warranty Information pamphlet that incorrectly set forth service intervals.

191.    Defendants intentionally, negligently, recklessly and/or fraudulently misrepresented to proposed class representative and proposed class members the characteristics of class vehicles with respect to engine design materials and/or manufacture together with information in the class vehicles' owner's manual and Service and Warranty Information pamphlet that incorporated incorrect engine inspection and service intervals.

192.    Defendants benefited financially from their breaches of warranty, misrepresentations and fraud as described in this complaint.  Defendants denied legitimate class vehicle engine warranty claims and obtained further unwarranted financial gain.

193.    The proposed class representatives and proposed class members sustained monetary damages as described in this complaint.

194.    Allowing Defendants to retain their monetary enrichment from their wrongful and unlawful acts would be unjust and inequitable.

195.    The proposed class representatives and proposed class members request that Defendants disgorge their profits from their wrongful and unlawful conduct and that the Court establish a constructive trust funded by the benefits conferred upon Defendants as a result of their wrongful conduct. The proposed class representatives and proposed class members should be designated beneficiaries of the trust and obtain restitution for their out-of-pocket expenses caused by Defendants' conduct.

196.    The proposed class representatives and proposed class members request judgment against Defendants for multiple damages, interest, costs and attorneys' fees.

**COUNT VI**
**INJUNCTIVE AND DECLARATORY RELIEF**
(declaratory relief on behalf of the New Jersey and Florida classes)

197.    Gardella, Renwick and the declaratory relief class hereby incorporate by reference all allegations in the preceding paragraphs as if set forth fully in this count.

198.    There is a justiciable dispute as to whether the oil pump incorporated in class engines should be covered under the Limited Powertrain Warranty and/or New Vehicle Limited Warranty accompanying class vehicles.

199.    Gardella, Renwick and the declaratory relief class seek certification pursuant to Fed. R. Civ. Proc., Rule 23(b)(2) and request a declaratory judgment declaring that, going forward, the remedial and/or replacement work necessary to correct the defective oil pump incorporated in class engines

together with all resulting damages are covered warranty claims.

200.    This remedy of final injunctive relief or corresponding declaratory relief is appropriate for and thereby requested for all members of the declaratory relief class who still possess their vehicles.

201.    This remedy is also authorized under the consumer fraud statutes of New Jersey and Florida together with all other states that grant each respective proposed class representative and proposed class member the right to seek injunctive or declaratory relief for violations of such consumer fraud statutes.

## RELIEF DEMANDED

Wherefore, proposed class representatives request:

(a) An Order pursuant to Fed. R. Civ. P. 23(c) certifying the class and/or classes as defined in ¶ 15 with such modifications, if any, to the proposed certification as required by the Court for the efficient and equitable administration of justice in this proceeding;

(b) An Order appointing proposed class representatives as representatives of the proposed class/classes and designating the law firms of Kantrowitz, Goldhamer & Graifman, P.C., and Thomas P. Sobran P.C. as counsel for the proposed class(es) pursuant to Fed. R. Civ. P. 23(g);

(c) Judgment for proposed class representatives and proposed class members against Defendants on all issues and counts;

(d) Actual, compensatory and/or statutory damages for proposed class representatives and proposed class members, including but not limited to multiple damages, together with interest, prejudgment interest, costs and attorneys' fees;

(e) Restitution for all engine repairs incurred by proposed class representatives and proposed class members resulting from the defectively designed and manufactured class engine oil pump and incorrect maintenance and service intervals as set forth in the class vehicles' owner's manual and Service and Warranty Information pamphlet;

(f) Restitution of incidental expenses incurred by proposed class representatives and proposed class members, including but not limited to rental vehicles and other substitute transportation;

(g) A court issued declaratory judgment declaring that all class vehicle class engine claims caused by defective oil pump are within the scope of the class vehicles' warranty coverage; and,

(h) Any other relief deemed necessary by this Court.

**REQUEST FOR JURY TRIAL**

The proposed class representatives and proposed class members request trial by jury on all issues and counts.

Dated: May 12, 2026

/s/ Gary S. Graifman
Gary S. Graifman, Esq.
Daniel C. Edelman, Esq.
**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**
135 Chestnut Ridge Road, Suite 200
Montvale, NJ 07645
Tel: (201) 391-7000
ggraifman@kgglaw.com
dedelman@kgglaw.com


/s/ Thomas P. Sobran
Thomas P. Sobran, Esq.
**THOMAS P. SOBRAN, P.C.**
7 Evergreen Lane
Hingham, MA 02043
(781) 741-6075
(to be admitted *pro hoc vice*)

***Attorneys for Plaintiffs***

45